UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN ROSALES,<br><br>    Movant-Defendant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Respondent-Plaintiff. | Civ. Case No.:  15cv802 BTM<br>Crim. Case No. 09cr3603 BTM<br><br>**ORDER DENYING § 2255 MOTION AND DENYING A CERTIFICATE OF APPEALABILITY** |

Defendant Juan Rosales has filed a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.  For the reasons discussed below, Defendant's motion is **DENIED**.

## I.  **FACTUAL BACKGROUND**

This criminal case arises out of a reverse-sting operation involving a fictional robbery of a narcotics stash house containing 25-30 kilograms of cocaine and a fictional kidnaping of the operator of the stash house.

According to the Statement of Facts in support of the Complaint filed against Rosales and co-defendants Miguel Angel Guzman, Robert Garcia, and Jose Rodriguez, on or about March 25, 2009, Special Agent Jason R. Weber with the

Bureau of Alcohol, Tobacco, Firearms, and Explosives, learned from a Confidential Informant ("CI") that Guzman operated a group of individuals that actively engaged in armed, home-invasion style robberies of narcotics "stash houses." Guzman and his crew would then traffic the narcotics stolen from these stash houses.

On or about May 5, 2009, Guzman offered to sell the CI and SDPD Detective Raul Delgadillo, who was undercover and introduced to Guzman as the CI's cousin, a 12-gauge shotgun. During this conversation, Guzman informed the CI that he, Rosales, and an individual identified as Alfredo Cabrera, were en route to conduct a home invasion robbery of a narcotics stash house and asked the CI if the CI could come along to serve as a "look-out." Reference was also made to the law-enforcement style badges that Guzman, Rosales and Cabrera had with them for use during the home invasion robbery. The CI declined the offer to serve as lookout.

On or about June 15, 2009, the CI and Det. Delgadillo met with Guzman to purchase a firearm. At this meeting, Delgadillo asked Guzman about the law enforcement badges and explained that he would need one to conduct a home-invasion style robbery of a narcotics "stash house." Guzman then told Delgadillo that there was no need for him to "get his hands dirty" and that he and his crew would be willing to take care of any robbery Delgadillo needed him to handle.

On or about August 20, 2009, the CI met with Guzman and informed him that

Delgadillo had received information that an individual in the San Diego area owed a substantial debt to drug trafficking organizations in Mexico. The CI explained that this individual operated a narcotics "stash house" that contained at least 25-30 kilograms of cocaine and that Delgadillo had received orders to "rip" this stash house. The CI asked Guzman if he would be interested in putting together a crew to conduct the robbery. Guzman expressed interest and asked the CI if he wanted the person kidnaped, taken to Mexico, or killed. The CI responded that the details would have to be worked out with Delgadillo. Guzman reiterated his willingness to conduct the home invasion robbery and said that he would be willing to have dinner with Delgadillo the following week to further discuss the home invasion.

On September 3, 2009, Guzman, the CI, and Delgadillo met for dinner. Delgadillo explained to Guzman that there would be at least three armed individuals guarding the stash house. When Delgadillo asked Guzman if he was still willing to go forward, Guzman stated, "This is what I do; this is how I pay my bills." Guzman told Delgadillo that he would assemble a crew to conduct the home invasion that included two family members. Guzman discussed how Delgadillo should alert him on his cell phone upon gaining access to the stash house. Guzman also suggested that each member of his crew get one or two kilograms of cocaine each and that he and Delgadillo split the remaining cocaine 50/50.

Guzman asked Delgadillo if the individual who controlled the stash house

1  was to be kidnapped as well.  Delgadillo said that he did not know yet and was
2  awaiting further instructions and orders from Mexico.  When Delgadillo asked
3  Guzman if his crew would be willing able to kidnap the individual as well, Guzman
4  stated that his crew would kidnap the individual if Delgadillo wanted them to, but
5  that Delgadillo would have to provide the crew a vehicle to transport the body in.
6  During the course of the meeting, Delgadillo reiterated to Guzman that the
7  individuals at the stash house would be armed.  Delgadillo told Guzman that if he
8  did not wish to go forward with the robbery, he did not have to.  Guzman repeatedly
9  responded with words to the effect of "this is what I do," and expressed his
10 willingness to plan and orchestrate the home invasion robbery.

11     On or about September 8, 2009, Delgadillo called Guzman and informed him
12 that he had received orders that the kidnaping was to be conducted in addition to
13 the robbery.  Guzman again expressed willingness to go forward with the plan.
14 Delgadillo told Guzman he would get in contact with him and arrange for a meeting
15 at a hotel the night before the home invasion was to take place.

16     On or about September 16, 2009, Delgadillo and the CI met Guzman at a
17 hotel in Chula Vista.  Guzman was accompanied by Rosales and Garcia.  Guzman
18 stated that Rosales would be in charge of the actual home invasion and that
19 Rosales, Garcia, and two other individuals, all of whom would be armed, would be
20 conducting the home invasion.  Delgadillo stated that there would be a minimum

of two armed guards plus the "boss" inside the house and told Guzman, Rosales, and Garcia that if they were not willing to go forward with the plan, then they should let Delgadillo know. All three men confirmed that they were willing to conduct the robbery.

Guzman again instructed Delgadillo how to alert him on his cell phone after he had gained entry into the stash house and determined whether narcotics were present. Guzman stated that if the narcotics were present, Rosales, Garcia, and the two other crew members would enter the house and tell everyone to lie on the ground. Rosales stated that he would be the only one giving instructions. Everyone, including Delgadillo, would be restrained with zip ties, then the "boss" was to be led out of the house and thrown in the waiting vehicle. Rosales stated that if the armed guards did not comply with the given instructions, they would either be shot or beaten until they complied. Rosales asked Guzman what they would do with Delgadillo. Guzman responded that they would take Delgadillo out of the stash house and throw him in the vehicle as well so it would not look like he was involved in the robbery. Delgadillo would then be untied once he was secure in the vehicle.

Delgadillo instructed the men to meet him in the morning at a 7-11 located in National City, at which time he would lead the crew to the vehicle he was providing for them. Delgadillo was informed that the vehicle, with the kidnap victim, would

then be returned to this location following the completion of the home invasion robbery. Delgadillo told the men that the cocaine they planned to "rip" was packaged in a very distinct way and that they would have to re-package it prior to selling it. The men indicated that they were familiar with how to repackage drugs.

On September 17, 2009, Guzman and Garcia, in one car, and Rosales, in another, arrived at the designated 7-11. Guzman then left to pick up Rodriguez. While waiting for Guzman to return, Delgadillo was engaged in conversation with Rosales and Garcia and learned that they had an SKS-type rifle with a pistol grip stock that they planned to use to conduct the home invasion. Once Guzman and Rodriguez returned to the 7-11, Delgadillo went over the final plans for the home invasion robbery with the men.

Delgadillo led Rosales and Garcia to the location of the "drop vehicle." Upon arrival, Garcia removed a large garment-type bag from the car he and Rosales arrived in and put it in the trunk of the "drop vehicle." At this point, Delgadillo gave a pre-determined signal to an arrest team and Rosales and Garcia were taken into custody. Guzman and Rodriguez were taken into custody shortly afterwards. The bag placed in the "drop vehicle" contained, among other things, one SKS-type rifle, duct tape, and ski masks. In addition, a .38 Spl caliber revolver was located under the "drop vehicle."

## II. PROCEDURAL HISTORY

On September 18, 2009, a complaint was filed against Guzman, Rosales, Garcia, and Rodriguez.  The complaint alleged that Defendants conspired to knowingly and intentionally possess with intent to distribute a controlled substance, to wit, 5 kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

On September 30, 2009, a grand jury returned an indictment against Defendants.  The indictment charged Rosales with knowingly and intentionally conspiring to possess with intent to distribute 5 kilograms and more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); knowingly and intentionally conspiring to kidnap, abduct, seize, confine, carry away, and transport in foreign commerce, an individual, and hold said individual for ransom payment or otherwise, in violation of 18 U.S.C. § 1201(c) (Count Two); and intentionally possessing in and affecting commerce a firearm after having previously been convicted in court of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2 (Count Eight).

Rosales entered into a Plea Agreement [Doc. 94] and agreed to plead guilty to Count Two (conspiracy to kidnap) of the indictment.  In the Plea Agreement, Rosales agreed to waive any right to appeal or collaterally attack the conviction and sentence unless the Court imposed a custodial sentence above the greater of

the high end of the guideline range recommended by the government pursuant to the agreement.  (Plea Agreement, § XI.)

On June 1, 2010, Rosales entered a guilty plea on Count Two.  On June 18, 2010, the Court issued an order accepting Rosales's guilty plea.

On August 20, 2010, the Court sentenced Rosales to 87 months of custody. Judgment was entered on August 31, 2010.

Rosales filed the instant motion on April 10, 2015.

### III.  DISCUSSION

Defendant brings this motion to vacate his sentence on the ground of actual innocence.  As discussed below, the Court denies Defendant's motion as time-barred.

A one-year statute of limitations applies to a § 2255 motion.  The one-year period runs from the latest of:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on

collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

Defendant does not claim to have brought his motion within the one-year period. Instead, Defendant invokes the equitable exception for an actual innocence claim. In McQuiggin v. Perkins, __ U.S.__, 133 S. Ct. 1924 (2013), the Supreme Court held that a prisoner who makes a proper showing of actual innocence may pursue his constitutional claims on the merits notwithstanding AEDPA's one-year statute of limitations. To invoke the miscarriage of justice exception to AEDPA's statute of limitations, a petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 1935 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).

Defendant contends that after his conviction, there was a change in the law that renders him legally innocent. A petitioner is actually innocent when he was convicted for conduct not prohibited by law. Alaimalo v. United States, 645 F.3d 1042, 1047 (9th Cir. 2011). Thus, a change in the law that is retroactive and applies to the merits of the petition to make it more likely than not that no reasonable juror would have convicted the petitioner, may support an actual innocence claim. Wooten v. Cauley, 677 F.3d 303, 307 (6th Cir. 2012).

Defendant cites to a "ground-breaking ruling" in United States v. Hudson, 3

F. Supp. 3d 772 (C.D. Cal. 2014). In Hudson, the Central District judge granted the defendant's motion to dismiss the indictment due to outrageous government conduct. The court held that the ATF's fake stash-house scheme transcended the bounds of due process and rendered the government's actions outrageous.

However, the Ninth Circuit reversed the district court's ruling in United States v. Dunlap, 593 Fed. Appx. 619 (9th Cir. 2014). The Ninth Circuit held that the district court erred in concluding that the government's conduct met the "extremely high standard" necessary to dismiss an indictment for outrageous government conduct. Id. at 620 (quoting United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013)). The Ninth Circuit reasoned that the government's conduct did not go beyond the bounds of what the Ninth Circuit found acceptable in Black:

> The ATF targeted individuals who had already demonstrated an interest in committing robberies, and did little more than "set the 'bait'" by inventing a fictitious cocaine stash house they could rob. Black, 733 F.3d at 310. Once the bait was set, Defendants "responded with enthusiasm." Id. at 307. They planned nearly every detail of the robbery without assistance, including how many men they would bring, what weapons they would use, how they would dress, how they would break into the stash house, how they would restrain any guards, where they would hide after the robbery, and where they would sell the stolen cocaine. Defendants themselves also provided the guns, disguises, and zip ties necessary for them to carry out the robbery according to the plans they made. The government's conduct here did not "violate fundamental fairness or shock the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." Williams, 547 F.3d at 1200 (internal quotation marks and alterations omitted).

Id. at 621.

In <u>Black</u>, which was decided after judgment was entered against Rosales, the Ninth Circuit affirmed the denial of the defendants' motions to dismiss for outrageous government conduct. Although the court found that the reverse sting operation at issue raised questions about possible overreaching, the defendants had not met the "extremely high standard" to establish a violation of fundamental fairness. <u>Black</u>, 733 F.3d at 298.

The Ninth Circuit identified the following factors as relevant to whether the government's conduct was outrageous: (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. <u>Id.</u> at 303.

In <u>Black</u>, the Ninth Circuit found that the government did not have any individualized suspicion of any of the defendants as being involved in stash house robberies when it dispatched the CI into the field, and that the stash house robbery was entirely the ATF's creation. However, the Ninth Circuit's concerns were mitigated because the defendants later told the undercover ATF agent that they had engaged in similar criminal activity in the past, and once the bait was set, the

defendants responded with enthusiasm and without further inducement by the government. Id. at 307. Indeed, the defendants on appeal were recruited by other defendants, not the ATF agent. Id. Furthermore, there was no evidence that the government engaged in inappropriate threats or coercion to encourage defendants to engage in the robbery. Id. at 308. Although the government took the initiative of approaching the defendants and proposing the fictitious stash house robbery, it played a minimal role thereafter. Id. at 309. The agent did not provide weapons, plans, manpower, or direction about how to perform the robbery. Id. In addition, the Ninth Circuit noted that stash house robberies pose a great risk of violence in residential communities, and the reverse sting tactic was designed to avoid these risks to the public and law enforcement officers by creating a controlled scenario that results in the capture of individuals willing to commit such an armed robbery without taking the final step of an actual home invasion. Id.

Neither Hudson nor Black constitutes an intervening change in law that establishes that Defendant was convicted for conduct not prohibited by the law. According to the government, the CI had information that Guzman had already engaged in stash-house robberies with others *before* Delgadillo brought up his plan to rob a stash house. On May 5, 2009, Guzman even informed the CI that he, Rosales, and Cabrera were en route to conduct a home invasion robbery of a stash house. Even though the government made up the fiction of Delgadillo

receiving orders to rob the stash house and to kidnap the "boss" of the stash house, it does not appear that the government coerced or threatened Rosales or the other Defendants into participating in the plan.  Based on the facts presented by the government, Rosales and the others were more than willing to carry out the robbery and kidnaping.  The government did not provide direction regarding how the robbery and kidnaping would occur and did not provide any manpower or weapons.  The facts of this case are similar to <u>Black</u> and do not meet the "extremely high standard" for establishing outrageous government conduct.

Accordingly, Defendant does not qualify for the actual innocence exception to the one-year statute of limitations set forth 28 U.S.C. § 2255(f).  Defendant's § 2255 motion was filed more than four-and-a-half years after judgment was entered in his case.  Therefore, his motion is time-barred.

//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the reasons discussed above, Defendant Juan Rosales's motion to vacate, set aside, or correct sentence under § 2255 is **DENIED**.  The Court **DENIES** a Certificate of Appealability.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated:  January 4, 2016

*Barry Ted Moskowitz*
Barry Ted Moskowitz, Chief Judge
United States District Court